IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TRACY MELISSA CURRY,

      Plaintiff,

v.                                              1:15-cv-00601-LF

NANCY A. BERRYHILL,[1]
Acting Commissioner of the
Social Security Administration,

      Defendant.

**MEMORANDUM ORDER AND OPINION**

THIS MATTER comes before the Court on plaintiff Tracy Curry's Motion to Reverse

and Remand for Rehearing (Doc. 16), which was fully briefed June 9, 2016 (Docs. 20, 21, 22).

The parties consented to my entering final judgment in this case.  Docs. 6, 8.  Having

meticulously reviewed the entire record and being fully advised in the premises, I find that Ms.

Curry's motion to reverse and remand is not well-taken, and it will be DENIED.

## I.    Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final

decision[2] is supported by substantial evidence and whether the correct legal standards were

applied.  *Maes v. Astrue,* 522 F.3d 1093, 1096 (10th Cir. 2008).  If substantial evidence supports

the Commissioner's findings and the correct legal standards were applied, the Commissioner's

decision stands, and the plaintiff is not entitled to relief.  *Langley v. Barnhart*, 373 F.3d 1116,

---

[1] Nancy A. Berryhill, the new Acting Commissioner of Social Security, is automatically substituted for her predecessor, Acting Commissioner Carolyn W. Colvin, as the defendant in this suit.  FED. R. CIV. P. 25(d).

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481, as it is in this case.

1118 (10th Cir. 2004).  "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."  *Jensen v. Barnhart,* 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted).  The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley,* 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Id.*  While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005).  "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'"  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.    Applicable Law and Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S.

137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show:
(1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe
medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is
expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the
Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or
her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399
F.3d at 1260–61.  If the claimant cannot show that his or her impairment meets or equals a
Listing but proves that he or she is unable to perform his or her "past relevant work," the burden
of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform
other work in the national economy, considering the claimant's residual functional capacity
("RFC"), age, education, and work experience.  *Id.*

### III.    Background and Procedural History

Ms. Curry was born on June 15, 1965, completed two years of college, and has past
relevant work as a bus driver, bus cleaner, car rental clerk, inventory clerk, hardware clerk, and
assistant manager.  AR 137, 162, 830.[4]  On November 21, 2006, Ms. Curry suffered a stroke.
AR 686.

Ms. Curry filed an application for disability insurance benefits ("DIB") on October 23,
2009—alleging disability since November 6, 2006 due to a stroke, memory problems, left side
paralysis, and high blood pressure.  AR 137–40, 161.  Ms. Curry was insured for disability

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

[4] Documents 12-1 through 12-46 comprise the sealed Administrative Record ("AR").  When
citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner
of each page, rather than the CM/ECF document number and page.

benefits through March 31, 2008.[5]  AR 141, 775.  On January 23, 2009, while her claim was pending, Ms. Curry suffered a second stroke.  AR 323–33.  The Social Security Administration ("SSA") denied her claims initially on January 19, 2010.  AR 83–86.  The SSA denied her claims on reconsideration on July 7, 2010.  AR 93–95.  Ms. Curry requested a hearing before an Administrative Law Judge ("ALJ").  AR 96–97.  On June 9, 2011, ALJ Barry Robinson held a hearing.  AR 28–79.  ALJ Robinson issued an unfavorable decision on February 22, 2012.  AR 11–25.  Ms. Curry requested review by the Appeals Council, which denied her request.  AR 3–7, 9–10.  Ms. Curry submitted additional evidence, but, on September 21, 2012, the Appeals Council declined to reopen or change the decision.  AR 1–2.  Ms. Curry filed her first appeal to this Court on October 18, 2012.  *See Curry v. Social Security Administration*, No. 12-cv-1074 WJ/SMV, Doc. 1 (D.N.M. Oct. 18, 2012).  On April 22, 2013, while her first appeal was pending, Ms. Curry filed a subsequent application for supplemental security income ("SSI").  AR 1021–29.  On November 1, 2013, the Honorable District Judge William P. Johnson remanded Ms. Curry's case based on two errors:  (1) the ALJ's failure to conduct a proper function-by-function analysis and (2) the ALJ's failure to explore the physical and mental demands of Ms. Curry's past relevant work.  *Curry*, No. 12-cv-1074 WJ/SMV, Doc. 24 at 4–9.

On remand, the Appeals Council remanded the case to an ALJ for a new hearing.  AR 883–86.  ALJ Ann Farris held a hearing on February 10, 2015.  AR 802–39.  At the hearing, Ms. Curry agreed to consolidate her subsequent application for SSI with her remanded case for DIB.  AR 773, 804–05.  ALJ Farris issued her partially favorable decision on March 13, 2015.  AR 769–801.

---

[5] To qualify for disability benefits, Ms. Curry had to show that she was disabled before March 31, 2008, her date last insured (DLI).  However, if qualified, she only would be entitled to retroactive benefits beginning on October 2, 2008, or for the twelve-month period immediately preceding her October 23, 2009 application for benefits.  *See* SSR 83-20, 1983 WL 31249, at *1.

The ALJ found that Ms. Curry was insured for DIB through March 31, 2008.  AR 777.

At step one, the ALJ found that Ms. Curry had not engaged in substantial, gainful activity since

November 6, 2006.  *Id.*  Because Ms. Curry had not engaged in substantial gainful activity for at

least twelve months, the ALJ proceeded to step two.  AR 777–79.  At step two, the ALJ found

that Ms. Curry suffered from the following severe impairments since November 6, 2006:  status

post cerebral vascular accident with residual left-hand weakness and hypertension, AR 777–78,

and the following severe impairments since January 23, 2009:  status post two cerebral vascular

accidents with no functional use of her left arm and left leg weakness, hypertension, and a mental

impairment "variously diagnosed to include schizophrenia, anxiety, PTSD, and a cognitive

disorder," AR 778.  At step three, the ALJ found that none of Ms. Curry's impairments, alone or

in combination, met or medically equaled a Listing.  AR 779.  Because the ALJ found that none

of the impairments met a Listing, the ALJ assessed Ms. Curry's RFC—both before and after

January 23, 2009.  AR 779–82, 782–88.  The ALJ found that, **prior to** January 23, 2009, Ms.

Curry had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)

except that she was limited to occasional handling and fingering with her left upper extremity."

AR 779.  The ALJ found that, **after** January 23, 2009, Ms. Curry had the RFC "to perform light

work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she has no functional use of

her left arm.  She also would be limited to simple and unskilled work."  AR 782.

At step four, the ALJ concluded that Ms. Curry was unable to perform any of her past

relevant work.  AR 789.  At step five, relying on the testimony of a vocational expert ("VE"), the

ALJ found that, prior to January 23, 2009, Ms. Curry was not disabled, concluding that she still

could perform jobs that exist in significant numbers in the national economy such as school bus

monitor, bakery worker, and counter clerk.  AR 789–90.  She further found that, after January

23, 2009, Ms. Curry was disabled, as there were no jobs that exist in significant numbers in the

national economy that she could perform.  AR 790–91.  Because this Court previously remanded

Ms. Curry's case, Ms. Curry was not required to seek Appeals Council review again, and the

ALJ's decision stands as the final decision of the Commissioner.  *See* 20 C.F.R. § 404.984(a).

Ms. Curry timely appealed to this Court on July 10, 2015.[6]  Doc. 1.

### IV.    Ms. Curry's Claims

Ms. Curry raises several arguments for reversing and remanding this case:  (1) the ALJ

failed to follow and apply SSR 83-20; (2) the ALJ failed to do a function-by-function assessment

as required by SSR 96-8p; (3) the ALJ's step five findings are not supported by substantial

evidence; and (4) the ALJ committed legal error at step five by applying the "Grids."  Doc. 16 at

2.  For the reasons discussed below, none of these claims merits remand.

### VI.    Analysis

#### A.    <u>The ALJ did not err by failing to follow and apply SSR 83-20; the ALJ was not required to consult a medical advisor.</u>

Ms. Curry argues that the ALJ erred by not following SSR 83-20 in determining the onset

date of her "post 2006 cerebral vascular accident with residuals and late effects, schizophrenia,

and cognitive disorder, which are impairments of non-traumatic origin."  Doc. 16 at 11–12.  She

says that she has a "slowly progressive impairment" where the "onset date must be inferred"—

thereby requiring the ALJ to call on the services of a medical advisor.  *Id.* at 12.[7]  I disagree.

---

[6] If the claimant does not file exceptions and the Appeals Council does not assume jurisdiction of
the case, the ALJ's decision becomes final 61 days after it is issued.  20 C.F.R. § 404.984 (b)–
(d); AR 385.  The claimant then has 60 days to file an appeal to this Court.  20 C.F.R. § 404.981.

[7] The Commissioner erroneously argues that SSR 83-20 "does not apply" to Ms. Curry's case.
Doc. 20 at 5.  SSR 83-20, however, outlines the relevant evidence an ALJ must consider in
determining the onset date for both traumatic and nontraumatic impairments.

An ALJ must determine whether a claimant is disabled, as well as an onset date of

disability.  SSR 83-20, 1983 WL 31249, at *1.  SSR 83-20 establishes guidelines for determining

the onset of disability dates in DIB and SSI[8] cases, and it

> sets forth an analytical framework for assessing the date of onset for a disability
> of traumatic or non-traumatic origin.  It provides that a disability is of "traumatic
> origin," where after the date of injury, "the individual is thereafter expected to die
> as a result or expected to be unable to engage in substantial gainful activity (SGA)
> (or gainful activity) for a continuous period of at least 12 months."  SSR 83-20, at
> 2.  Where a disability is of traumatic origin, the date of onset is the date of the
> traumatic injury.  *Id.*
>
> Additionally, SSR 83-20 provides a framework for examining injuries that
> are not considered of "traumatic origin" under the regulation.  SSR 83-20 states
> that "[i]n disabilities of nontraumatic origin, the determination of onset involves
> consideration of the applicant's allegations, work history, if any, and the medical
> and other evidence concerning impairment severity."  *Id.*  The date alleged by the
> claimant is the starting point for determining disability onset, and the date the
> claimant stopped working is also of significance in selecting the onset date.  *Id.*
> Medical evidence, however, is the "primary element" for the onset determination,
> as the onset date "can never be inconsistent with the medical evidence of record."
> *Id.* at 2–3.
>
> SSR 83-20 also provides that, when medical evidence does not establish
> the precise onset date, the ALJ may have to "infer the onset date from the medical
> and other evidence that describe the history and symptomatology of the disease
> process."  *Id.* at 2.  The regulation provides two examples of situations where it
> may be necessary to infer an onset date:  (1) in the case of a slowly progressing
> impairment, "when, for example, the alleged onset and the date last worked are
> far in the past and adequate medical records are not available," and (2) when
> "onset of a disabling impairment(s) occurred some time prior to the date of the
> first recorded medical examination."  *Id.* at 3.  "At the hearing, the [ALJ] should
> call on the services of a medical advisor when onset must be inferred."  *Id.*

*Blea v. Barnhart*, 466 F.3d 903, 909–10 (10th Cir. 2006).

"[A] medical advisor need be called only if the medical evidence of onset is ambiguous."

*Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (internal citation and quotation omitted).  If a

disability is of traumatic origin, the onset date will be self-evident, and there is no need for the

ALJ to consult a medical advisor.  *Blea*, 466 F.3d at 910.  In addition,

---

[8] SSR 83-20 acknowledges that determination of a specific date of onset is not typically
necessary in a Title XVI (SSI) case.  SSR 83-20, 1983 WL 31249, at *7.

whether a medical advisor is required under SSR 83-20 does not turn on whether
the ALJ could reasonably have determined that [the claimant] was not disabled
before [her last insured date].  Rather, when there is no contemporaneous medical
documentation, we ask whether the evidence is ambiguous regarding the
possibility that the onset of her disability occurred before the expiration of her
insured status.  If the medical evidence is ambiguous and a retroactive inference is
necessary, SSR 83-20 requires the ALJ to call upon the services of a medical
advisor to insure that the determination of onset is based upon a "legitimate
medical basis."

*Id.* at 911 (quoting *Grebenick v. Chater*, 121 F.3d 1193, 1200–01 (8th Cir. 1997)).

In this case, the ALJ was not required to consult a medical advisor because the onset date

was not ambiguous.  Ms. Curry's 2006 stroke is an injury of nontraumatic origin.[9]  As such, in

determining an onset date for disability, the ALJ was required to consider "the applicant's

allegations, work history, if any, and the medical and other evidence concerning impairment

severity."  *Blea,* 466 F.3d at 909.  The ALJ thoroughly discussed all of these factors in her step

two and RFC findings.  *See* AR 777–82.  Other than asserting that the ALJ did not conduct an

adequate function-by-function analysis—an argument the Court does not find persuasive, *see*

discussion in section B, *infra*—Ms. Curry does not challenge any of the ALJ's step two or RFC

findings.  The ALJ thoroughly examined Ms. Curry's limitations after her first stroke, and

supported her RFC finding that she could perform light work, with the additional limitation to

occasional handling and fingering, with substantial evidence.  *See* discussion in section B, *infra*.

Ms. Curry's unsupported allegations that the onset date was ambiguous and that her 2006 stroke

was a slowly progressive impairment are without merit.  The Court finds no error in the ALJ's

decision not to consult a medical advisor about this impairment.

---

[9] *Blea* states that "a disability is of 'traumatic origin,'" only where, after the date of injury, "the
individual is thereafter expected to die as a result or expected to be unable to engage in
substantial gainful activity (SGA) (or gainful activity) for a continuous period of at least 12
months."  466 F.3d at 909.  Ms. Curry's 2006 stroke does not meet these requirements.

Ms. Curry's only support for her claim that the record is ambiguous and that the ALJ was therefore required to consult a medical advisor is that "there is . . . a question about what triggered Ms. Curry's second stroke," and that "[h]er severe problems did not develop overnight." Doc 16 at 14. The medical evidence Ms. Curry offers, however, does not support this assertion. *See id.* Ms. Curry argues that the fact that Dr. Craig Jensen, a doctor treating her after her January 23, 2009 stroke, found that she had "acute renal failure, an acute cerebrovascular accident, anemia and profound hyponatremia," and that "the etiologies of her such severe decompensation [were] unclear" creates an ambiguity in the medical record about whether she was disabled by her 2006 stroke, and whether she was disabled before March 31, 2008, her date last insured. Doc. 16 at 14. I disagree.

Ms. Curry repeatedly characterizes her 2006 stroke as a "cerebrovascular accident with residuals and late effects." *E.g.*, Doc. 16 at 11. But she cites no medical or other evidence to support her assertion that she got progressively worse after her first stroke. As the Commissioner argues, "[Ms. Curry] appears to suggest in her brief that her stroke residuals were 'slowly progressive,' but the record simply fails to support such a suggestion." Doc. 20 at 5. Instead of showing a "slowly progressing impairment," the record evidence shows that Ms. Curry's symptoms gradually *improved* after her first stroke. *See* AR 227 (2009 Progress Note Report stating, "Individual had a previous CVA ["cerebrovascular accident"] in 2006 which involved slurred speech, dysarthria and some weakness to her lower extremities. She gradually improved and gained complete control of her functions following that CVA.").

Ms. Curry also argues that "the medical evidence regarding the onset of Ms. Curry's schizophrenia, and cognitive disorder is ambiguous and there is a dearth of medical information regarding its progress." Doc. 16 at 12. The Commissioner argues that Ms. Curry's mental

impairments/schizophrenia was not a slowly progressive impairment which required the ALJ to infer a disability onset date.  Doc. 20 at 6.[10]  I agree with the Commissioner.

Ms. Curry admits that she did not receive psychological care during the relevant time period (between November 2006, the date of alleged onset, and March 31, 2008, the date last insured).  She argues, however, that, because there are medical records from before and after this period, the ALJ was required to consult a medical advisor to determine the onset date of disability from these impairments.  Doc. 16 at 12–14.  In support of her argument, Ms. Curry states that she has a history of delusions between 1997 and 2000.  *Id.* at 12–13.  She also cites the mental health treatment she received in 2010.  *Id.* at 13.

The ALJ thoroughly analyzed her reasons for concluding that Ms. Curry did not have a severe mental impairment prior to January 23, 2009.  *See* AR 778–79.  The record shows that the ALJ considered all of the medical records about Ms. Curry's treatment for mental impairments.  AR 778.  The ALJ also reviewed the paragraph B criteria for evaluating mental disorders: activities of daily living, social functioning, concentration/persistence/pace, and episodes of decompensation.  AR 778–79.  The ALJ concluded that "the record does not contain any treatment notes, diagnosis, or complaints to establish any limitations due to these conditions between November 2006 and March 2008."  AR 778.  The ALJ acknowledged that Ms. Curry stated that she could not afford care during this time, but she also found that Ms. Curry did not "require any psychiatric emergency care and was able to work above substantial gainful levels after April 2000."  *Id.*  The ALJ also noted that Ms. Curry's mental health treatment was many

---

[10] The Commissioner also argues that "[t]he ALJ did not find Plaintiff disabled in January 2009 due to mental impairments . . . ."  Doc. 20 at 6.  While the ALJ did state that Ms. Curry's "physical limitations alone resulted in a finding of disability," AR 791, the Court notes that the ALJ also found that, after January 23, 2009, Ms. Curry had a severe "mental impairment variously diagnosed to include schizophrenia, anxiety, PTSD, and a cognitive disorder."  AR 778.

years after her alleged onset date, and that the treatment notes "indicate on several occasions that the claimant sought mental health treatment at her attorney's request." *Id.* The ALJ further noted that "the lack of treatment between 2006 and March 2008 suggests that these conditions did not impair her ability to work at that time." *Id.* Ms. Curry does not specifically challenge any of the ALJ's reasons for concluding that she did not have a severe mental impairment prior to January 23, 2009. Instead, Ms. Curry merely cites several mental health treatment notes from treatment she received well after her date last insured, and even after the date the ALJ found she was disabled. These citations do not support her argument that the date of disability onset for her mental health impairments is ambiguous.

First, Ms. Curry cites a March 8, 2010 visit to the UNM Psychiatric Center. Doc. 16 at 13 n.9. The treatment note shows that Ms. Curry sought mental health care after her second stroke (in 2009) because of "a dramatic decline in feelings of worthiness" after her second stroke, due to limited abilities to cook for herself and do things she had done in the past. AR 616. There is nothing in this medical record to indicate that Ms. Curry was disabled by a mental impairment during the relevant time period—November 2006 to March 31, 2008. Second, Ms. Curry references a June 6, 2011 medical source report by Judy Vinczel, LPCC. Doc. 16 at 13 n.9; *see also* AR 697–702. While LPCC Vinczel's report indicates that Ms. Curry had significant work-related restrictions as of June 6, 2011, nothing in this medical record indicates that Ms. Curry was disabled by a mental impairment during the relevant time period. The ALJ considered this report and gave the opinion "moderate weight" because LPCC Vinczel is not an acceptable medical source, and because the record does not contain the treatment notes. AR 786. Ms. Curry does not challenge the ALJ's assessment or weighing of the medical opinion. Third, Ms. Curry references a June 24, 2011 report by Dr. Baum, who evaluated Ms. Curry for the

Social Security Administration.  Doc. 16 at 13 (citing AR 756–57).  Ms. Curry advised Dr. Baum that she had no psychiatric or neurologic history prior to her strokes, and denied any current symptoms.  AR 756–57.  Dr. Baum found no behavioral abnormalities and no psychotic features. AR 757.  Dr. Baum found a mild neurocognitive disorder, and diagnosed her with dysthymia and schizophrenia by history only.  *Id*.  Nothing in this medical report indicates that Ms. Curry was disabled by a mental impairment during the relevant time period.  The ALJ gave Dr. Baum's opinion "little weight" because it was internally inconsistent, and was based on her past history rather than on her current mental condition.  AR 786.  Ms. Curry does not challenge the ALJ's assessment or weighing of the medical opinion.

Finally, Ms. Curry references a psychological report from clinical psychologist Emily Moore, PhD, who assessed Ms. Curry on March 7, 2014, at the request of Ms. Curry's attorney. Doc. 16 at 13–14 (citing AR 1713).  Ms. Curry points to the fact that Dr. Moore believed that she likely had had schizophrenia for the past 17 years.  *Id*.  The ALJ gave this opinion "little weight," however, and found that "the claimant's ability to ignore the voices and the lack of further reporting of auditory hallucinations until 2014 suggests they were not present or did not impact the claimant prior to this time."  AR 787.  The ALJ found Dr. Moore's finding that Ms. Curry's cognitive impairment "could be related to her stroke or head trauma from a fall during the stroke, or could be associated with schizophrenia," to be speculative.  *Id*.  The ALJ emphasized that Ms. Curry did not receive any mental health treatment between 2000 and 2009, and that there was no other documentation of mental health symptoms during this time period. *Id*.  Ms. Curry does not challenge the ALJ's assessment or weighing of Dr. Moore's medical opinion.

In sum, Ms. Curry fails to point to any evidence—medical, testimonial, or other—indicating that her impairments were the type of slowly progressive impairments which might require the ALJ to consult a medical advisor. Ms. Curry also points to no evidence indicating that the onset date of her disability is ambiguous. A lack of medical evidence and treatment during the relevant time period by itself is not enough to require the ALJ to consult a medical advisor. The ALJ did not err in failing to consult a medical advisor. Therefore, remand on this issue is denied.[11]

**B. The ALJ did not err by failing to conduct a function-by-function assessment.**

Ms. Curry argues that the ALJ failed to perform an adequate function-by-function analysis before finding that she had the RFC to perform light work with the additional limitation of only occasional handling and fingering with her upper left extremity. Doc. 16 at 17.[12] This argument is without merit.

---

[11] The cases Ms. Curry cites are either not on point, or are distinguishable. Two of the district court cases Ms. Curry cites involve situations in which the SSA had approved the claimant for benefits based on a second application while a first application was pending. *See Willingham v. Astrue*, No. 11-cv-508 LAM, Doc. 19 at 3 (D.N.M. Aug. 22, 2012); *Perez v. Colvin*, No. 14-cv-819 KBM, Doc. 25 at 2 (D.N.M. Dec. 10, 2015). Unlike these cases, Ms. Curry's case involves one consolidated application for both DIB and SSI benefits. Furthermore, other judges in this District have found the same arguments which were successful in *Willingham* and *Perez* to be unpersuasive. *See Jaramillo v. Colvin*, No. 14-cv-298 SMV, Doc. 25 at 7–10 (D.N.M. May 4, 2015); *Ortega v. Colvin*, No. 15-cv-688 WPL, Doc. 29 at 15–17 (D.N.M. Nov. 29, 2016). The other case Ms. Curry cites is distinguishable. *Trujillo v. Astrue* was remanded because claimant had multiple sclerosis, an impairment which this Court found to be slowly progressive. No. 10-cv-0885 JCH/KBM, Doc. 22 at 1 (D.N.M. June 20, 2011). In contrast, Ms. Curry has failed to show that her impairments are slowly progressive.

[12] The Court previously remanded this case because the ALJ failed to consider the seven strength demands, and failed to support his RFC determination with substantial evidence. *See* AR 844–50. In the initial adjudication, the ALJ found Ms. Curry capable of doing a full range of medium work, and concluded that she was not disabled because she was capable of doing her past relevant work. AR 17, 20. Judge Johnson remanded the case specifically because the ALJ failed to discuss state medical consultant Dr. John Vorheis's RFC findings for the period before January 23, 2009. AR 846; *see also* AR 552–59. The Court notes that, in the current adjudication on appeal, ALJ Farris found Ms. Curry more limited than did Dr. Vorheis. AR 783.

Step Four of the sequential evaluation process is comprised of three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996).

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), . . . and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. . . .  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. . . .  At each of these phases, the ALJ must make specific findings.

*Id*. (internal citations omitted).

An "RFC determines a work capability that is exertionally sufficient to allow performance of at least substantially all of the activities of work at a particular level."  SSR 83-10, 1983 WL 31251, at *2.  It is a reflection of "the maximum amount of each work-related activity the individual can perform," and the ALJ must describe the "individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *7.  "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  *Id*.

An ALJ may not initially express an RFC in terms of "sedentary," "light," "medium," "heavy," and "very heavy,"—the exertional levels of work.  *Id*. at *3.  To ensure accuracy, "[t]he RFC assessment must *first* identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  *Id*. at *1 (emphasis added).  The ALJ may express the RFC in terms of exertional levels only after performing a function-by-function analysis.  *Id*.

---

Thus, the specific reason for the first remand based on the failure to perform a function-by-function analysis is no longer at issue.

A function-by-function assessment is the description of an "individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." *Id.* at *7.  Without this initial step "an adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id*. at *4.  The ALJ is required to address "an individual's limitations and restrictions of physical strength and define [ ] the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing and pulling." *Id*. at *5.  For example, "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours." *Id*.  "Each of the seven strength demands must be considered separately." *Southard v. Barnhart*, 72 F. App'x 781, 784 (10th Cir. 2003) (unpublished) (citing SSR 96-8p, 1996 WL 374184, at *3–4).

An ALJ's failure to do an explicit function-by-function analysis does not always require remand, however.  In *Hendron*, the Tenth Circuit held that the ALJ did not err by finding that Ms. Hendron could perform a "full range of sedentary work" without an "explicit function-by-function analysis." *Hendron v. Colvin,* 767 F.3d 951, 956 (10th Cir. 2014).  The court did not require an explicit function-by-function analysis because there was no evidence supporting a limitation in the claimant's ability to sit during the relevant two-month time period; therefore, the analysis was not critical to the outcome of the case. *Id.* at 956–57.  Similarly here, Ms. Curry points to no evidence supporting any limitation in her seven strength demands during the relevant time period which the ALJ failed to adequately consider, and which would affect the outcome of this case.  As in *Hendron*, the ALJ's failure to do a more explicit function-by-function analysis was harmless.

15

In Ms. Curry's case, the ALJ thoroughly discussed the evidence about Ms. Curry's limitations, and provided substantial evidence for her RFC findings.  The ALJ found that the medical evidence showed that Ms. Curry suffered an acute cerebral vascular accident in November 2006, and upon discharge was ambulating well with some loss of function to her left upper extremity, and with left facial droop.  AR 780.  The ALJ also noted that Ms. Curry did not receive any additional medical care until February 2007, with a visit to PA Heather Dountas at Lovelace Medical Group.  AR 780.  At this visit, Ms. Curry reported that her speech was no longer slurred.  *Id.*  PA Dountas determined that Ms. Curry had slightly decreased grip strength in her left hand, a normal gait, and that her strength was five out of five in both her upper and lower extremities.  AR 780–81.  The ALJ further noted that Ms. Curry's next treatment record in June 2008, shortly after her date last insured, did not include any complaints, a fact the ALJ concluded showed that Ms. Curry was not significantly limited after her first stroke.  AR 781.  In addition, the ALJ reviewed the treatment records after Ms. Curry's second stroke, which documented her medical history.  Those records showed that Ms. Curry had regained complete control of her functions following her first stroke and had no "residual deficits" after her first stroke.  AR 781.

In addition, the ALJ discussed Ms. Curry's testimony about limitations to her left hand and arm after her first stroke and before her second stroke.  AR 781–82.  The ALJ noted that in her June 2011 testimony, Ms. Curry denied having any problems with sitting, standing, walking, or talking.  AR 781.  She stated that she was able to rehabilitate her left hand within 6 to 12 months after her first stroke so that it was useable and "she could hold onto little things."  AR 781–82.  She also "testified that she would use her left hand and arm like they were normal

although they were a little weak and she was limited to lifting about five pounds."  AR 782.[13]

After discussing this testimony and all of the medical evidence, the ALJ concluded her analysis:

> In sum, the records indicate that [Ms. Curry] was minimally limited by her left hand weakness.  She testified in June 2011 that she could lift five pounds with her left hand [after][14] her first stroke.  She also reported that before her second stroke, she could bring in the groceries, do everyday housework, and walk her two dogs but did note that she did most of this with her right arm.  While her February 2015 testimony suggested more limitations as discussed above, I find it to be less credible and also note as discussed below that claimant has developed some memory problems which could impact her ability to remember her condition before her second stroke.  I have accommodated the weakness to her left upper extremity by limiting her to light work with only occasional handling and fingering with her left upper extremity.  However, I do not find that she was completely unable to use her left arm after the first stroke.

AR 782.

Ms. Curry argues that the ALJ's RFC is not supported by substantial evidence because it is unclear how she would be able to frequently lift and carry—as required by "light work"—while limited to "occasional" handling with her left arm.  Doc. 16 at 18.  The Court finds this argument unpersuasive because it conflates exertional and nonexertional limitations.[15]

A nonexertional limitation—such as a limitation in the ability to "handle"—does not necessarily affect a claimant's ability to do the strength demands required by "light work."  The SSA classifies work in the national economy by the exertional levels of sedentary, light,

---

[13] The ALJ found Ms. Curry's February 2015 testimony—in which she claimed that after her first stroke she had vision and hearing problems and frequently bumped into things, and was unable to use a camera—not credible because it conflicted with her June 2011 testimony, and was inconsistent with the February 2007 treatment note from PA Dountas.  AR 781–82.

[14] The ALJ erroneously stated "prior to her first stroke."  However, at the hearing, in response to the ALJ's question about what she could lift after her first stroke, Ms. Curry testified that she could lift a five pound bag of sugar with her left arm.  AR 43–44.

[15] The Commissioner also seems to conflate exertional and nonexertional limitations, arguing only that Ms. Curry's argument is a "red herring" because Ms. Curry would be able to perform the requirements of light work with her dominant right arm and hand, with occasional assistance from her left arm and hand.  Doc. 20 at 7.

medium, heavy or very heavy.  SSR 83-10, 1983 WL 31251, at *2.  The levels of work are defined by the extent that they require each of the primary strength activities—sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Id.* at *2, *5.  A claimant has an exertional limitation when she has an impairment-caused limitation that affects her ability to perform an exertional, or strength, activity.  *Id.* at *5.

Conversely, a nonexertional impairment is an impairment "which does **not** directly affect the ability to sit, stand, walk, lift, carry, push, or pull."  *Id.* at *6 (emphasis added).  Nonexertional impairments include impairments which affect the ability to handle and the ability to use the fingers for fine activities.  *Id.*  A claimant has a nonexertional limitation when she has an impairment-caused limitation that affects her ability to perform "work activities **other than the primary strength activities**."  *Id.* at *7 (emphasis added); *see also Trimiar v. Sullivan*, 966 F.2d 1326, 1328 n.3 (10th Cir. 1992) ("Nonexertional limitations are 'medically determinable impairments, such as . . . postural and manipulative limitations . . . [that] do not limit physical exertion." (quoting 20 C.F.R. § 404.1545(d)).

In this case, the ALJ found that, exertionally, Ms. Curry was limited to light work.  AR 779.  The ALJ then found that Ms. Curry had the additional nonexertional limitations of being limited to occasional handling and fingering with her upper left extremity.  AR 779.  Handling is defined as "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands."  SSR 85-15, 1985 WL 56857, at *7.  "'Fingering' involves picking, pinching, or otherwise working primarily with the fingers."  *Id.*

Ms. Curry attempts to argue that the exertional strength demands of lifting require "an effective ability to handle."  Doc. 16 at 18.  This argument is a non sequitur given that the SSA defines nonexertional limitations (such as Ms. Curry's limitations in handling and fingering) as

limitations that affect a claimant's ability to perform work activities "other than the primary strength activities."  SSR 83-10, 1983 WL 31251, at *7.  The VE's testimony at step five demonstrates that handling and fingering are not necessarily required to perform the strength demands of light work.  The ALJ asked the VE if there were jobs Ms. Curry could do if she were limited to light work, and could only occasionally handle and finger with her left, non-dominant arm.  AR 830.  In response to this inquiry, the VE testified that Ms. Curry could perform the following three jobs at the light exertional level:  (1) School bus monitor, DOT # 372.667-042 (2) Bakery worker, DOT #524.687-022, and (3) Counter clerk, DOT # 249.66-010.  AR 832–34.  All three of these jobs at the light exertional level require only occasional handling and fingering for both hands.[16]  Because there are a number of light exertional jobs that can be performed with only occasional handling and fingering, Ms. Curry's argument that her ability to lift and carry is automatically compromised by a limitation on her ability to handle is without merit.  The Court finds no error in the ALJ's assessment of Ms. Curry's exertional work-related abilities.  Ms. Curry fails to point to any limitation during the relevant time period that the ALJ failed to adequately address.  Thus, as in *Hendron*, the Court declines to remand this case based on a function-by-function error.

### C.   The ALJ's step-five findings are supported by substantial evidence.

Ms. Curry argues that the ALJ's findings at step five are not supported by substantial evidence.  Doc. 16 at 19–21.  She argues that the number of available jobs were "borderline" and

---

[16] The DOT lists exertional job requirements.  Non-exertional job requirements (such as those for reaching, handling, and grasping) are found in *The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (*"SCO").  *See* SSR 85-15, 1985 WL 56857.  The SCO, available at http://www.nosscr.org/sco/sco.pdf, defines how often a non-exertional activity is required for a particular job:  ranging from Not Present (N), to Occasionally (O), Frequently (F), or Constantly (C).  SCO, Identification Key, ID-2.

"doubtful," and that the ALJ erred by not further analyzing the number of available jobs using the *Trimiar* factors.  *Id.* at 21.  In addition, Ms. Curry argues that it is unclear what methodology the VE relied upon in determining the number of jobs in the national economy for the selected jobs the VE found she still could perform.  *Id.* at 20.  These arguments are not persuasive.

### 1.   The ALJ adequately considered the *Trimiar* factors.

"The [claimant] bears the burden of proving disability within the meaning of the Social Security Act.  Having shown that his disability precludes return to his prior employment, the 'burden of going forward shifts to the Secretary, who must show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy.'"  *Trimiar,* 966 F.2d at 1329 (quoting *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984)).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy" is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id.*; *see also Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009) (an ALJ may "look[ ] to the national economy—not just a local area" in determining whether there is a significant number of available jobs).[17]

---

[17] Ms. Curry argues that the numbers of jobs the ALJ found she could perform were not significant because "neither a total of 13,000, a total of 1,400, nor a total of 6,900 jobs available in the national economy rises to a significant level as defined in 42 U.S.C. § 423(d)(2)(A).  The result would lead to only 260, 28, and 138 jobs per state, respectively."  Doc. 16 at 21.  As the Commissioner points out, this argument must fail.  Doc. 20 at 8.  First, the ALJ is not required to

The Tenth Circuit has never drawn a bright line establishing the number of jobs necessary to constitute a "significant number," holding instead that each case should be evaluated on its individual merits. *Trimiar*, 966 F.2d at 1330.  In *Trimiar*, the court analyzed whether the relatively small number of jobs in the state of Oklahoma which the VE testified that the claimant could perform—between 650 and 900 jobs—constituted a "significant number."  966 F.2d at 1330.  The Tenth Circuit noted that "several factors go into the proper evaluation of significant numbers." *Id.*

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include:  the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.

*Id.* (quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988)).  The court in *Trimiar* concluded that "[t]he decision should ultimately be left to the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation."  *Id.*

After reviewing both the transcript of the hearing and the ALJ's decision, the court in *Trimiar* found that the ALJ had adequately considered the relevant factors.  *Id.* at 1332 ("We need not strain at numbers in reaching our conclusion that the ALJ's decision is founded on substantial evidence on the record.  The record indicates that the ALJ weighed the relevant factors in reaching his conclusion.").  The court consequently affirmed the ALJ's "factual finding" that significant numbers of jobs existed.  *See Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008) (unpublished).  Thus, as long as the Court is satisfied that the ALJ adequately

---

find that each job exists in significant numbers.  *See* 20 C.F.R. § 404.1566 ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.").  Second, there is no legal requirement for the ALJ to find significant numbers of jobs in the state.  *See Raymond*, 621 F.3d at 1274 ("controlling statutes, federal regulations, and case law all indicate that the proper focus generally must be on jobs in the national, not regional, economy").

considered the *Trimiar* factors, and as long as her "decision is founded on substantial evidence on the record," *Trimiar*, 966 F.2d at 1332, this Court will not disturb an ALJ's factual finding that the number of jobs available is significant.

The ALJ need not formally discuss each of the *Trimiar* factors; it is sufficient if the Court, "[i]n reviewing the transcript of the hearing and the decision of the ALJ [is] convinced that the ALJ gave proper consideration to the[] factors." *Trimiar*, 966 F.2d at 1330.  The Court need only be convinced that the ALJ used "common sense in weighing the statutory language as applied to a particular claimant's factual situation."  *See id.*; *see also Hill v. Colvin*, No. CIV-13-1232-HE, 2015 WL 1412581, at *8 (W.D. Okla. Mar. 26, 2015); *Baca v. Astrue*, No. 09-cv-290 ACT, Doc. 22 at 8–10 (D.N.M. Feb. 25, 2010).

In this case, both the ALJ's decision and the hearing testimony demonstrate that the ALJ adequately considered the relevant *Trimiar* factors:  the level of the claimant's disability; the reliability of the vocational expert's testimony; the distance the claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; and the types and availability of such work.  In addition, substantial evidence supports the ALJ's decision.

The ALJ's decision establishes that she thoroughly considered the level of Ms. Curry's disability.  AR 777–88.  In addition, the ALJ adequately addressed the reliability of the VE's testimony.  The ALJ asked the VE whether her professional qualifications on record were accurate and up to date, and Ms. Curry's counsel stated that he had no objections to the VE's qualifications.  AR 829.  The ALJ also instructed the VE that her testimony needed to be in accord with the Dictionary of Occupational Titles and its companion publications.  AR 829.  In her decision, the ALJ stated that she had determined that the VE's testimony was consistent with the DOT.  AR 790.  The ALJ also noted in her decision that the VE "explained that she looked

for jobs that required minimal [handling][18] and fingering" because, while the DOT addresses the use of the upper extremities, "it [does] not address limited use of only one upper extremity."  AR 790.  The ALJ considered and included Ms. Curry's impairments—those supported by the record—in her hypothetical questions to the VE.  AR 830–35.[19]  In her decision, the ALJ, relying on the VE's testimony, considered the types of work available, and the numbers of positions available.  AR 790 (finding that Ms. Curry could perform the jobs of school bus monitor, bakery worker, and counter clerk, which represented 13,000, 1,400, and 6,900 jobs respectively).  The ALJ specifically held that "[b]ased on the testimony of the vocational expert . . . the claimant was capable of making an adjustment to other work that existed in significant numbers in the national economy."  AR 790.

   With regard to Ms. Curry's ability to travel to the assigned work, Ms. Curry testified at the first administrative hearing that she had two car accidents after her first stroke.  AR 47.  At the second administrative hearing, the ALJ asked Ms. Curry if she still drove, and Ms. Curry testified that she did.  AR 816.  Ms. Curry also testified that she after the first stroke she only "dropped driving at night a little bit."  AR 811.  The ALJ noted in her decision that, after Ms. Curry's first stroke, she still was able to drive solo from Albuquerque, New Mexico to Honduras.  AR 779.  Thus, while there is some conflicting information in the record about Ms. Curry's

---

[18] The ALJ adopted the VE's erroneous reference to "reaching" instead of "handling."  AR 790.  As Ms. Curry points out, the VE often misspoke during the hearing, mentioning "reaching" instead of "handling."  Doc. 16 at 23 n.20; AR 832–34.  A review of the SCO for the DOT numbers of the jobs the VE testified Ms. Curry still could perform show that this error is harmless, as all of the identified jobs require only occasional handling.  *See* SCO, available at http://www.nosscr.org/sco/sco.pdf at 46, 299, 333.

[19] The ALJ posed the following hypothetical to the VE:  "assuming a person of the same age, education, and work history as the claimant is limited to light work, but could only occasionally handle and finger with the left arm, which is the nondominant arm, would such a person be able to perform any category of claimant's past work?"  AR 830–31.  The ALJ later asked the VE if there would be other jobs in the national economy that such a person could perform.  AR 831.

ability to drive after her first stroke, the Court finds that the ALJ adequately considered this factor.  Finally, there is nothing in the record to suggest that the jobs of school bus monitor, bakery worker, or counter clerk are isolated in nature; nor does Ms. Curry make any such assertion in her brief.  The ALJ properly considered the relevant *Trimiar* factors.  The Court therefore will not disturb the ALJ's factual finding that the 21,300 jobs available to Ms. Curry constitute a substantial number.  The Court may "not presume to interpose [its] judgment for that of the ALJ."  *See Trimiar*, 966 F.2d at 1332.

### 2.  The VE's methodology is not a basis for remand.

Ms. Curry argues that the ALJ's step five decision is not supported by substantial evidence because it is unclear what methodology the VE used to ascertain the number of jobs available for the DOT descriptions for school bus monitor (DOT # 372.667-042), bakery worker (DOT # 524.687-022), and counter clerk (DOT #249.366-010).  Doc. 16 at 20.  Despite arguing that the VE's methodology is unclear, Ms. Curry then posits that the VE must have relied on Department of Labor ("DOL") statistics for "Transportation Attendants, Except Flight Attendants"—despite an apparent mismatch between the job descriptions for school bus monitor in this category and the DOT description of a school bus monitor.  *Id.* at 20–21.  This argument is mere conjecture.

Ms. Curry offers no evidence to support her theory that the VE derived the numbers of jobs from the DOL statistics for "Transportation Attendants, Except Flight Attendants," and the record is silent on this matter.  Ms. Curry cites no law to support her assertion that the VE was required to derive the number of available jobs from DOL statistics.[20]  Without support in fact or law, Ms.

---

[20] The regulations allow the ALJ to take administrative notice of "reliable job information available from various governmental and *other* publications":  "(1) Dictionary of Occupational Titles, published by the Department of Labor; (2) County Business Patterns, published by the

Curry asks this Court to reverse the ALJ's decision.  The Court declines the invitation.  The *only* record evidence concerning the number of jobs available to Ms. Curry in the national economy is the testimony of the VE.  Under Tenth Circuit precedent, the ALJ properly may rely on such testimony to support a step-five finding.  *See Trimiar*, 966 F.2d at 1334.  Accordingly, the Court finds that substantial evidence supports the ALJ's step-five analysis.

### D.  <u>The ALJ did not conclusively rely on the grids at step five.</u>

Ms. Curry argues that the ALJ may have improperly relied on the "grids."  Doc. 16 at 21.  Ms. Curry argues that the ALJ erred in concluding that her limitation to "occasional handling and fingering with her upper left extremity" did "not significantly erode the light exertional base."  *Id.*  This argument also is without merit.

> Step five involves two stages:
>
> First, the [ALJ] must assess each claimant's present job qualifications.  The regulations direct the [ALJ] to consider the factors Congress has identified as relevant: physical ability, age, education and work experience.  Second, [the ALJ] must consider whether jobs exist in the national economy that a person having the claimant's qualifications could perform.

*Heckler v. Campbell*, 461 U.S. 458, 460–61 (1983) (internal citations omitted).  Prior to 1978, the SSA relied on VEs to establish the existence of suitable jobs in the national economy.  *Id.* at 461.  In 1978, to improve uniformity and efficiency at the second stage of step five, the SSA promulgated the medical-vocational guidelines ("the grids").  *Id.*; *see also* 20 C.F.R. § 404, subpt. P, app. 2.  The grids "consist of a matrix of the four factors identified by Congress—

---

Bureau of the Census; (3) Census Reports, also published by the Bureau of the Census; (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics."  20 C.F.R. § 404.1566.  As in *Gay v. Sullivan*, the claimant here "has advanced no authority or reasoned explanation for [her] critical assumption that the range of professional sources" is limited to those in claimant's argument.  986 F.2d 1336, 1340 (10th Cir. 1993) ("Indeed, what would be the point of vocational testimony (or expert testimony in general) if it could not reach beyond matters already established through administrative (or judicial) notice?").

physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Id.* at 461–62.

"[T]he grids may not be applied conclusively in a given case unless the claimant's characteristics precisely match the criteria of a particular rule." *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984).[21] When the characteristics do not precisely match, an ALJ must give full consideration "to all of the relevant facts of the case, and the existence of jobs in the national economy for that individual must be further considered in terms of what kinds of jobs or types of work may be either additionally indicated or precluded." *Id.* (internal citations and quotations omitted). "[B]ecause the grids consider only impairments that result in *exertional* or strength limitations, they may not be fully applicable where other, *nonexertional* impairments are present." *Id.* at 577.

When a claimant has exertional and nonexertional impairments, the ALJ conducts a two-part analysis:

> the Secretary's regulations mandate that the grids be applied first, to determine whether the claimant is disabled by reason of the exertional impairments alone. 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2). If the claimant is not so disabled, the ALJ must then make a second individualized determination using the grids only as a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.

*Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987) (internal citation and quotation omitted). When a claimant has both exertional and nonexertional limitations, an ALJ must elicit

---

[21] To conclusively rely on the grids, an ALJ must make the following findings, each supported by substantial evidence: "(1) that the claimant has no significant nonexertional impairment, (2) that the claimant can do the full range of work at some RFC level on a daily basis, and (3) that the claimant can perform most of the jobs in that RFC level." *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

"vocational expert testimony . . . to determine whether jobs exist for someone with the claimant's precise disabilities." *Trimiar*, 966 F.2d at 1333 (internal citations and quotations omitted). "Without the grids, the ALJ must resort to testimony from a vocational expert to establish that a significant number of jobs exist in the national economy which the claimant can perform." *Id*.

While the ALJ's step-five findings in this case are somewhat muddled, the Court does not find that the ALJ improperly relied on the grids.  Instead, the ALJ followed the two-part analysis outlined in *Frey*, 816 F.2d 508.  First, the ALJ applied the grids to determine if Ms. Curry was disabled by her exertional impairments alone, and concluded that she was not:

> Prior to January 23, 2009, if the claimant had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations.

AR 789.  Finding she was not disabled under the grids, the ALJ proceeded to "make a second individualized determination using the grids only as a framework."  *Frey*, 816 F.2d at 513.  The ALJ correctly stated that she "must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines [the grids]."  AR 789.  The ALJ also correctly stated that "[w]hen the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules [the grids] are used as a framework for decisionmaking. . . ."  AR 789.

Accordingly, instead of relying on the girds, the ALJ elicited VE testimony to determine whether jobs exist in the national economy for someone with Ms. Curry's precise disabilities. AR 789 ("To determine the extent to which these limitations eroded the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for

an individual with the claimant's age, education, work experience, and residual functional capacity."). The ALJ then explicitly stated that her conclusion that Ms. Curry was capable of making a successful adjustment to other work that existed in significant numbers in the national economy was "[b]ased on the testimony of the vocational expert." AR 790. The ALJ concluded her discussion of the VE testimony by stating that a "finding of 'not disabled' is therefore appropriate under the framework" of the grids. AR 790.

The regulations state that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his or her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(b). The VE's testimony established the existence of such jobs in this case. Thus, the ALJ's step-five findings satisfied the statutory and regulatory requirements requiring proof that Ms. Curry can engage in substantial gainful work that exists in significant numbers in the national economy.

Given that the ALJ concluded, based on the VE's testimony, that Ms. Curry was not disabled because she could adjust to other work that existed in significant numbers in the national economy, the Court finds that any error in the final paragraph of the ALJ's step-five analysis is harmless. The Court acknowledges that some of the language in the final paragraph of the ALJ's step-five findings supports an argument that the ALJ applied the grids. *See* AR 790; *Ramirez v. Astrue*, 255 F. App'x 327, 330 n.1 (10th Cir. 2007) (unpublished) (noting that the ALJ's findings that claimant "could perform substantially all of the exertional requirements of light work and that his nonexertional impairments [did] not significantly limit the range of available light work job" were findings that must be made in order to conclusively apply the grids). However, the last paragraph of the ALJ's step-five findings cannot be read in isolation.

When read in its entirety, the ALJ's step-five analysis does not indicate that the ALJ conclusively applied the grids.  Instead, the last paragraph of the ALJ's step-five analysis is unnecessary to her finding that there were significant jobs in the national economy that Ms. Curry could meet.  The ALJ concluded, based on the VE's testimony alone, that there were a significant number of jobs Ms. Curry could perform.  AR 790.  Having so concluded, her reasoning in the next paragraph, "[i]n addition" to the VE's testimony, is superfluous.  *See id.* The ALJ met the step-five burden through the VE's testimony.  The ALJ was required to do nothing further.  *See Amason v. Colvin*, No. 4:11-CV-805-A, 2013 WL 1413023, at *11 (N.D. Tex. Mar.1, 2013) (holding that ALJ adequately analyzed the erosion of the occupational base by eliciting testimony from a VE about specific jobs claimant could still perform and the number of available jobs); *see also Gutierrez v. Barnhart*, 109 F. App'x 321, 328 (10th Cir. 2004) (unpublished) (ALJ who erroneously applied the grids could have met step five burden by soliciting evidence from a VE about "specific light jobs" that exist in significant numbers).

## VII.    Conclusion

The ALJ properly applied SSR 83-20, and was not required to consult a medical advisor. The ALJ did not err by failing to conduct a function-by-functions assessment in formulating Ms. Curry's RFC.  Furthermore, substantial evidence supports the ALJ's step-five findings, and the ALJ did not conclusively rely on the grids.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 16) is DENIED.

Laura Fashing
United States Magistrate Judge
Presiding by Consent